REGINALD MORTON FOUNTAIN, JR., Plaintiff v. CHRISTINE MAZZA FOUNTAIN, Defendant

No. COA01-14

(Filed 5 February 2002)

**1. Divorce— equitable distribution—classification—note receivable—separate property**

   The trial court did not err in an equitable distribution case by classifying the note receivable on a Cessna Citation Jet as plaintiff husband's separate property even though the payments on the jet came out of an account containing marital funds, because plaintiff met his burden of showing the monies used to pay for the jet were separate monies derived from his separate property.

**2. Divorce— equitable distribution—classification—funds in bank account—separate property**

   The trial court did not err in an equitable distribution case by classifying the funds on deposit in the pertinent bank account on 2 September 1998 as plaintiff husband's separate property, because plaintiff met his burden of showing the monies were acquired from his separate property.

**3. Divorce— equitable distribution—classification—increase in value of grocery store—separate property**

   The trial court did not err in an equitable distribution case by classifying the increase in value of the pertinent grocery store as plaintiff husband's separate property, because: (1) plaintiff met

FOUNTAIN v. FOUNTAIN

[148 N.C. App. 329 (2002)]

his burden of showing the increase was passive; and (2) defendant wife abandoned her argument that the monies received from a life insurance loan used to renovate the grocery store building was marital property since she failed to argue it in her brief as required by N.C. R. App. P. 28(a).

**4. Divorce— equitable distribution—valuation method— stock options**

The trial court did not err in an equitable distribution case by adopting the intrinsic value method and by failing to apply the Black-Scholes Stock Option Pricing Model as the sole method to value the 480,000 stock options owned by plaintiff husband, because: (1) the trial court's valuation method will be accepted by the Court of Appeals if it is a sound valuation method based on competent evidence and is consistent with N.C.G.S § 50-21(b); and (2) the intrinsic value method is an acceptable method for reasonably approximating the value of stock options.

**5. Divorce— equitable distribution—vested stock options— full ownership retained by owner spouse**

The trial court did not abuse its discretion in an equitable distribution case by awarding all the pertinent vested stock options to plaintiff husband with defendant wife receiving a larger portion of other assets instead of defendant receiving a portion of the vested stock options if and when plaintiff exercised those options.

**6. Divorce— equitable distribution—distributional factor— surgeries**

The trial court erred in an equitable distribution case by considering defendant wife's breast implants, liposuction, and cosmetic nose surgeries as a distributional factor, because: (1) the mere fact that defendant lived a portion of the last few years of the marriage in Maryland rather than in the marital home with plaintiff husband in North Carolina is not sufficient evidence to support a determination the parties were experiencing marital breakdown or that the surgeries were in anticipation of separation; and (2) the evidence established that the parties were still engaged in a marital relationship and plaintiff had encouraged defendant to have the second breast implant surgery performed.

**7. Divorce— equitable distribution—distributional factors— place of residence during marriage**

The trial court erred in an equitable distribution case by considering the decision of defendant wife to primarily reside in Maryland while the marital home was in North Carolina and plaintiff husband's decision to travel to Maryland to attempt to keep the marriage afloat as distributional factors, because: (1) although defendant's actions may have contributed to the demise of the marriage, marital fault alone is not sufficient to support a distributional factor; and (2) the costs involved of living in Maryland and traveling to that state to visit were incurred for marital purposes in an attempt to make the marriage work and not for non-marital purposes.

Appeal by defendant from judgment filed 19 April 2000 by Judge Jerry F. Waddell in Carteret County District Court. Heard in the Court of Appeals 4 December 2001.

*Charles William Kafer, for plaintiff-appellee.*

*Lea, Clyburn & Rhine, by J. Albert Clyburn and James W. Lea, III, for defendant-appellant.*

GREENE, Judge.

Christine Mazza Fountain (Defendant) appeals an equitable distribution judgment and order filed 19 April 2000.

Reginald Morton Fountain, Jr. (Plaintiff) and Defendant were married on 21 April 1993 and separated on 2 September 1998 (the period between 21 April 1993 and 2 September 1998 will be referred to as "the marriage"). No children were born during the marriage. The parties lived together continuously in North Carolina from 21 April 1993 until early 1994, when Defendant moved back to the home of her parents on Kent Island, Maryland. From 1994 through 1998, Defendant spent very little time in the marital home, but Plaintiff made serval trips to Maryland for the purpose of visiting Defendant during this time. On 3 September 1998, Plaintiff filed a complaint seeking a divorce from bed and board and equitable distribution. Defendant, however, did not file an answer to Plaintiff's complaint and default was entered against Defendant on 21 October 1998. Subsequently, Plaintiff was granted a divorce from bed and board on 26 October 1998. On 30 September 1999, Defendant filed a complaint praying for equitable distribution, along with other re-

lief. On 23 November 1999, the trial court dismissed most of Defendant's claims but preserved and consolidated her claim for equitable distribution.

The trial on the issue of equitable distribution began on 14 February 2000 and lasted approximately eleven days. The property to be classified, valued, and distributed included, in pertinent part: 480,000 stock options (the FPB stock options) received from Plaintiff's employer Fountain Powerboats, Inc. (FPB); Plaintiff's checking account (the First Citizens Account); Defendant's checking accounts; Eastbrook Apartments; Fairview Shopping Center Realty (Fairview); Fairview Foods (Piggly Wiggly); and a note receivable on a Cessna Citation Jet (the FPB note). During the course of the trial, Plaintiff offered his testimony along with seventeen other witnesses and Defendant offered her testimony along with nine other witnesses.

---

The issues are: (I) the marital property classification of: (A) the FPB note; (B) the funds on deposit in the First Citizens Account; and (C) the post-marriage increase in value of Piggly Wiggly; (II) (A) the proper method for classifying stock options; (B) the proper method for valuing stock options; and (C) the proper distribution of stock options; and (III) the use of the following, as distributional factors: (A) Defendant's surgeries; and (B) Defendant's place of residence during the marriage.

I

*Classification of Property*

In equitable distribution actions, the trial court is required to classify, value, and distribute marital property, including marital debt, and divisible property, including divisible debt. N.C.G.S. § § 50-20(a), 50-20(b)(4)(d) (1999); *Byrd v. Owens*, 86 N.C. App. 418, 423, 358 S.E.2d 102, 106 (1987). A "party claiming that property is marital has the burden of proving beyond a preponderance of the evidence" that the property was acquired: by either or both spouses; during the marriage; before the date of separation; and is presently owned.[1] *Lilly v. Lilly*, 107 N.C. App. 484, 486, 420 S.E.2d 492, 493 (1992). "If the party meets this burden, then 'the burden shifts to the party claiming the

---

1. With respect to debt, the burden is on the party claiming the debt to be marital to show it was "incurred during the marriage and before the date of separation by either spouse or both spouses for the joint benefit of the parties." *Huguelet v. Huguelet*, 113 N.C. App. 533, 536, 439 S.E.2d 208, 210, *disc. review denied*, 336 N.C. 605, 447 S.E.2d 392 (1994).

property to be separate to show by a preponderance of the evidence that the property meets the definition of separate property.' " *Id.* (citation omitted). If both parties meet their burdens, the property is considered separate property. *Ciobanu v. Ciobanu,* 104 N.C. App. 461, 466, 409 S.E.2d 749, 752 (1991). Separate property includes

> [1] all real and personal property acquired by a spouse before marriage[;] . . . [2] [p]roperty acquired in exchange for separate property[; and] . . . [3] increase[s] in value of separate property and income derived from separate property . . . .

N.C.G.S. § 50-20(b)(2) (1999). If, however, the separate property enjoys an increase in value "attributable to the [substantial] financial, managerial, and other contributions of the marital estate" (an active increase), any increase in value would be marital property. *Ciobanu,* 104 N.C. App. at 465, 409 S.E.2d at 751; *O'Brien v. O'Brien,* 131 N.C. App. 411, 421, 508 S.E.2d 300, 307 (1998), *disc. review denied,* 350 N.C. 98, 528 S.E.2d 365 (1999). If a passive increase in separate property occurs, i.e. inflation, that increase would remain separate property. *Wade v. Wade,* 72 N.C. App. 372, 379, 325 S.E.2d 260, 268, *disc. review denied,* 313 N.C. 612, 330 S.E.2d 616 (1985). Commingling of separate property with marital property, occurring during the marriage and before the date of separation, does not necessarily transmute separate property into marital property. *O'Brien,* 131 N.C. App. at 419, 508 S.E.2d at 306; *Lilly,* 107 N.C. App. at 487, 420 S.E.2d at 494. Transmutation would occur, however, if the party claiming the property to be his separate property is unable to trace the initial deposit into its form at the date of separation. *O'Brien,* 131 N.C. App. at 419, 508 S.E.2d at 306.

A

*The FPB Note*

[1] Defendant first argues the Cessna Citation I (the Cessna), acquired by Plaintiff after marriage and before the date of separation, was marital property and thus the FPB note taken by Plaintiff when he sold the Cessna, which had a value of approximately $315,000.00 at the time of separation, is marital property. This argument is based on her claim that the monies used to pay for the Cessna came out of the First Citizens Account that contained marital funds, and to the extent the Cessna was paid for from this account, it (and the FPB note given in exchange for the Cessna) is marital property. Plaintiff admits the funds used to make the payments on the Cessna mortgage

FOUNTAIN v. FOUNTAIN

[148 N.C. App. 329 (2002)]

came out of the First Citizens Account and that the account contained marital funds, but he contends the monies used to pay for the Cessna were separate monies and the commingling of these separate monies in the First Citizens Account did not transmute all the monies in that account into marital property. Plaintiff argues the monies placed in the First Citizens Account to cover the Cessna mortgage payments came from a lease of the Cessna and, because the Cessna was obtained in exchange for the Piper Cheyenne I (the Piper) and the Piper was his separate property, the lease monies put into the First Citizens Account were his separate monies. It follows, he contends, the Cessna was his separate property, as was the FPB note received in exchange for the sale of the Cessna. We agree with Plaintiff.

In this case, Plaintiff acquired the Piper prior to the marriage and gave a lien on the Piper to secure a note (the Piper note) in the amount of $444,005.70. After the purchase of the Piper, Plaintiff leased it to FPB and the lease payments were used to make the payments on the Piper note. Early in the marriage, the Piper lease payments were placed in the First Citizens Account and the Piper note payments were made from this account. The lease income was in an amount sufficient to make the Piper note payments and also to cover the maintenance expenses of the aircraft. In 1996, Plaintiff traded the Piper for the Cessna, which was titled in Plaintiff's name, and he gave a lien on the Cessna to secure a note (the Cessna note). The Cessna was also leased to FPB and the lease payments were placed into the First Citizens Account and payments were made on the Cessna note from that account. The lease income from the Cessna was in an amount sufficient to make the Cessna note payments and also to cover the maintenance expenses of the aircraft. In 1997, Plaintiff sold the Cessna to FPB and he received in exchange for that sale the FPB note in the amount of $415,820.57.

As Plaintiff owned the Piper prior to the marriage, it was Plaintiff's separate property and thus the income received from the lease of the Piper after the marriage remained Plaintiff's separate property.[2] N.C.G.S. § 50-20(b)(2). The deposit of that income into an account containing marital funds (a commingling) required Plaintiff, in order to preserve the separate classification of these monies, to trace those deposits into the payments on the Piper note. The record

---

2. As the income was received during the marriage and before the date of separation, Defendant met her burden of showing the income was marital property. Plaintiff, however, met his burden of showing the income was his separate property, as it was derived from his separate property.

shows Plaintiff satisfied this burden.[3] When Plaintiff exchanged the Piper for the Cessna, the Cessna became Plaintiff's separate property since the Piper remained Plaintiff's separate property at the time of the transfer.[4] N.C.G.S. § 50-20(b)(2). The payments Plaintiff received for the lease of the Cessna were commingled with marital funds in the First Citizens Account, but again, the record shows Plaintiff met his burden of tracing those account funds into the payments on the Cessna note.[5] Thus, the Cessna remained Plaintiff's separate property entirely,[6] and when it was sold and Plaintiff received the FPB note in exchange, that note was properly classified by the trial court as Plaintiff's separate property.

## B

### *The First Citizens Account*

[2] Defendant next argues the funds on deposit in the First Citizens Account on 2 September 1998 should have been classified as marital property. We disagree.

We have determined the FPB note represents "separate property" and was correctly classified as Plaintiff's separate property. Thus, the proceeds from any payments on that note were Plaintiff's separate property.[7] On 2 September 1998 (the day the parties separated), a payment was deposited into the First Citizens Account on the FPB note in the amount of $157,910.98. The only other monies in that account on the date of separation were $16,877.55, which represented income from a separate property belonging to Plaintiff.[8] That income was

---

3. At trial, Plaintiff presented detailed records of every deposit into the First Citizens Account, showing the source of the funds, and every payment from that account, showing the purpose of the payment.

4. If marital funds had been used to make the Piper note payments, the equity established in the Piper as a result of those marital payments would have constituted marital property.

5. At trial, Plaintiff presented detailed records of every deposit into the First Citizens Account, showing the source of the funds, and every payment from that account, showing the purpose of the payment.

6. If marital funds had been used to make the Cessna note payments, the equity established in the Cessna as a result of those marital payments would have constituted marital property.

7. As the proceeds from the FPB note were received during the marriage and before the date of separation, Defendant met her preliminary burden of showing these proceeds were marital. Plaintiff, however, met his burden of showing the proceeds to be his separate property, as it was income derived from his separate property.

8. The undisputed testimony is that the $16,877.55 in the account represented income from Eastbrook Apartments. The trial court classified these apartments as

also Plaintiff's separate property. N.C.G.S. § 50-20(b)(2). Accordingly, the funds in the First Citizens Account were properly classified by the trial court as Plaintiff's separate property.

## C

### Piggly Wiggly

[3] Defendant contends the trial court erred in finding Piggly Wiggly "contains no marital component." We disagree.

In this case, Plaintiff acquired a 75% interest in Piggly Wiggly prior to marriage, and his share in the value of Piggly Wiggly on the date of marriage was $62,102.29. At the time of the separation, Plaintiff's share of Piggly Wiggly was worth $77,352.00, indicating an increase in value during the marriage of $15,249.71.[9] Defendant does not contest the classification of the Plaintiff's interest in Piggly Wiggly as Plaintiff's separate property, but instead contends the trial court erred in classifying the increase in the value of that asset as Plaintiff's separate property.

The evidence shows Piggly Wiggly was managed by the 25% owner and Plaintiff had no involvement in the operations of the business. In 1996-97, renovations were made to the Piggly Wiggly building and Plaintiff paid his share of the cost of those renovations from monies received from a personal loan from First Citizens Bank, monies received from a loan from his Northwestern Life Insurance policies (the Northwestern policies) in the amount of $514,707.00, and monies received from his margin account at Wheat First Securities. Defendant makes no argument in her brief to this Court that the monies received from the Wheat First Securities account or received from First Citizens Bank were marital property. She does argue, however, that the monies received from the Northwestern policies did constitute marital property because the funds used to pay the premiums on the Northwestern policies over the course of the marriage came from the First Citizens Account. The trial court, however, found the cash value in various life insurance policies, including the Northwestern policies, was Plaintiff's separate property. Although

Plaintiff's separate property and although Defendant assigned error to this classification, the issue was not addressed in her brief to this Court and is thus abandoned. *See* N.C.R. App. P. 28(a).

9. At trial, Defendant offered testimony that Plaintiff's share of the increase was in the amount of $280,981.50. The trial court rejected this testimony and although Defendant assigned error to this, she did not argue the matter in her brief to this Court. Accordingly, she has abandoned this issue. *See* N.C.R. App. P. 28(a).

Defendant assigned error to this finding, the argument was not addressed in her brief to this Court and is thus abandoned. *See* N.C. R. App. P. 28(a). It thus follows Defendant cannot now argue the monies received from the life insurance loan used to renovate the Piggly Wiggly building were marital. Accordingly, the trial court correctly classified the entire post-marriage increase in the value of Piggly Wiggly as Plaintiff's separate property.[10]

## II

## A

### Classification of Stock Options

As a general proposition, stock options can be vested or non-vested, matured or non-matured, and restricted or unrestricted.[11] *Equitable Distribution of Stock Options*, 17 Equitable Distribution Journal 85, 86 (Aug. 2000). Like retirement benefits,[12] stock options are a salary substitute or a deferred compensation benefit and if received during the marriage and before the date of separation and acquired as a result of the efforts of either spouse during the marriage and before the date of separation, stock options are properly classified as marital property, even if they cannot be exercised until a date after the parties divorce. If the stock options are "acquired as a result of the efforts of either spouse during the marriage and before the date of separation" and "received after the date of separation but before the date of distribution," the options are properly classified as di-

10. As the increase in value of Piggly Wiggly occurred during the marriage and before the date of separation, Defendant met her burden of proving the increase was marital. Plaintiff, however, met his burden of showing the increase was his separate property by showing the increase was passive.

11. In this case, the stock options were vested, matured, and restricted. Firstly, they were vested because the right to exercise the options could not be canceled. Secondly, they were matured because the right to exercise the options was exercisable before the date of separation. Finally, they were restricted because they could not be transferred, except upon Plaintiff's death.

12. Most states treat stock options, vested and nonvested, "in a manner analogous to the treatment" of retirement benefits. *Equitable Distribution of Stock Options*, 17 Equitable Distribution Journal at 87. This Court has previously held that "consistent with North Carolina's equitable distribution statutes," only vested stock options could be classified as marital property. *Hall v. Hall*, 88 N.C. App. 297, 307, 363 S.E.2d 189, 195 (1987). At the time of *Hall*, our equitable distribution statutes allowed only vested pensions to be treated as marital property. Since *Hall*, however, our equitable distribution statutes have been amended to define marital property to include vested and nonvested pensions. N.C.G.S. § 50-20(b)(1) (1999). Thus, a correct and current reading of our equitable distribution statutes is that marital property includes vested and nonvested stock options.

visible property. N.C.G.S. § 50-20(b)(4)(b) (1999). If the options are received during the marriage before the date of distribution and not in consideration for services rendered during the marriage and before the date of separation, the options are neither marital nor divisible.[13] In this case, Plaintiff does not contest the marital classification of the vested and matured FPB stock options.

B

*Valuation of the Stock Options*

[4] Defendant argues the trial court erred "by failing to apply the Black[-]Scholes Stock Option Pricing Model to value the 480,000 [FPB] stock options" owned by Plaintiff, suggesting this should be the sole method for determining value.[14] We disagree.

If there is "no single best approach to valuing" an asset, "[t]he task of [this Court] on appeal is to determine whether the approach used by the trial court reasonably approximated" the value of the asset at the date of separation. *Poore v. Poore*, 75 N.C. App. 414, 419, 331 S.E.2d 266, 270, *disc. review denied*, 314 N.C. 543, 335 S.E.2d 316 (1985); N.C.G.S. § 50-21(b) (1999) (marital property to be valued "as of the date of the separation of the parties, and evidence of . . . post-separation occurrences or values is competent as corroborative evidence"). If it appears "the trial court reasonably approximated the net value of the [asset] . . . based on competent evidence and on a sound valuation method or methods, the valuation will not be disturbed." *Poore*, 75 N.C. App. at 422, 331 S.E.2d at 272. Further, the trial court's findings concerning valuation are binding on this Court if supported by competent evidence. *Patton v. Patton*, 78 N.C. App. 247, 255, 337 S.E.2d 607, 612 (1985), *reversed in part on other grounds*, 318 N.C. 404, 348 S.E.2d 593 (1986).

---

13. If the stock options are received during the marriage and before the date of separation, the spouse claiming the options to be marital has met her burden of proof. The spouse claiming the options to be nonmarital has the burden of showing they were acquired (in whole or in part) as the result of services to be rendered beyond the date of separation. *See* N.C.G.S. § 50-20.1(d) (1999) (method for determining the proportion of the pension, retirement, or deferred compensation benefits properly classified as marital or divisible).

14. Defendant, in her oral argument to this Court, contended the trial court erred in excluding testimony of her Black-Scholes expert on the value of the FPB stock options held by Plaintiff. There is no assignment of error or argument in her brief to this Court to support this contention. Accordingly, we do not address the question of whether the trial court erred in excluding the testimony in this case. *See* N.C. R. App. P. 10(a).

This Court has not adopted an approach for valuing stock options.[15] Therefore, the trial court's valuation method will be accepted by this Court if it is a sound valuation method, based on competent evidence, and is consistent with section 50-21(b). In this case, the trial court adopted the "intrinsic value method," which is an acceptable method for reasonably approximating the value of stock options, and valued Plaintiff's FPB stock options by taking the difference between the market price of FPB stock at the date of separation and the stock option price held by Plaintiff. The trial court, thus, did not err in failing to adopt the Black-Scholes Method for valuing the FPB stock options.

## C

### Distribution of Stock Options

[5] As a general rule, it is presumed that an "in-kind distribution of marital or divisible property is equitable."[16] N.C.G.S. § 50-20(e) (1999). When, however, the property is an interest in a closely held corporation, this in-kind presumption may be rebutted. *Id.* In any event, the trial court may provide for a distributive award, N.C.G.S. § 50-20(b)(3) (1999), to effectuate the distribution, N.C.G.S. § 50-20(e). Specifically, with respect to "pension[s], retirement, or other deferred compensation benefits," the methods of distribution are limited. N.C.G.S. §§ 50-20.1(a)-(b) (1999). Unless the parties agree on the distributional method, the trial court must order the owner of the benefit to pay a prorated portion of the benefit to the non-owner spouse at the time he receives the benefit. *Id.* (vested and nonvested benefits). This is known as a deferred distribution. *Bishop v. Bishop*, 113 N.C. App. 725, 731-32, 440 S.E.2d 591, 596 (1994). If the benefit is vested, the trial court may instead elect, in its discretion, to award a "larger portion of [the] other assets to the party not receiving the

---

15. "[A]ccording to *Harvard Business Review* author Brian J. Hall, writing the March-April 2000 issue, the value of an option is typically measured with the 'Black-Scholes pricing model or some variation.' This method takes into account the stock price, the exercise price, the maturity date, the prevailing interest rates, the volatility of the company's stock, and the company's dividend rate." *Equitable Distribution of Stock Options*, 17 Equitable Distribution Journal at 89. Another accepted method of valuing stock options is known as the "intrinsic value method" which determines value by subtracting the option price from the fair market value of the stock. *Id.*; *see Richardson v. Richardson*, 659 S.W.2d 510, 513 (Ark. 1983).

16. Marital stock, as opposed to marital stock options, is subject to an in-kind distribution and unless specifically provided for, any restriction on the transfer of that stock does not apply to court ordered interspousal transfers. *See Bryan-Barber Realty, Inc. v. Fryar*, 120 N.C. App. 178, 182, 461 S.E.2d 29, 32 (1995).

benefit[]" and allow the owner spouse to retain full ownership of the benefit. N.C.G.S. § 50-20.1(a)(4) (1999). Stock options are within the scope of "other deferred compensation" and fall within the scope of section 50-20.1, thus, in-kind distributions under section 50-20(e) are not permitted. Because of their nature, however, a deferred distribution of stock options presents some complex issues, including: who will supply the funds used to purchase the stock; what are the tax consequences of the purchase and transfer of the stock; and if the stock increases in value after the date of separation and before the date of exercise, is any increase the result of the owner spouse's efforts or the result of inflation. A trial court may avoid these complications by distributing vested stock options under section 50-20.1(a)(4). If the stock options are not vested, the trial court has no choice but to distribute under section 50-20.1(b)(3) (1999) (by "appropriate domestic relations order"), although it may choose to place conditions on the distribution, i.e. require non-owner spouse to provide the funds to the owner spouse to make the purchase or non-owner spouse to save owner spouse harmless from any tax liability incurred as a consequence of purchase. *See Callahan v. Callahan*, 361 A.2d 561, 564 (N.J. Super. Ct. Ch. Div. 1976).

In this case, the trial court rejected Defendant's argument that she should receive a portion of the vested FPB stock options if and when Plaintiff exercised those options.[17] The trial court instead chose, in its discretion, to award all the FPB stock options to Plaintiff with Defendant receiving a larger portion of the other assets.[18] We discern no abuse of discretion.

### III

### *Distributional Factors*

The trial court is required to divide marital and divisible property equitably. N.C.G.S. § 50-20(a). In determining an equitable distribu-

---

17. Defendant also argues the trial court erred in not imposing a constructive trust for her benefit on the FPB stock options. We reject this argument. A constructive trust is based on the same principles as a deferred distribution, giving the non-owner spouse an interest in the stock options when and if they are exercised by the owner spouse. In rejecting the imposition of a constructive trust, the trial court noted it would constitute an award to Defendant for work done by Plaintiff "after the marriage." This *is an appropriate consideration.*

18. Of the 480,000 stock options, 30,000 were awarded to Plaintiff without any compensation to Defendant because the trial court found that 30,000 of the stock options had expired and were worthless at the time of its order.

tion, the trial court is to consider those factors set out in section 50-20(c). N.C.G.S. § 50-20(c) (1999). Under the catch-all provision of section 50-20(c), the trial court is permitted to consider "[a]ny . . . factor which [it] finds to be just and proper." N.C.G.S. § 50-20(c)(12) (1999). A factor is just and proper, within the meaning of section 50-20(c)(12), if it is an action related "to the economic condition of the marriage." *Smith v. Smith*, 314 N.C. 80, 87, 331 S.E.2d 682, 687 (1985). Thus, the expenditure of "marital assets for non-marital purposes by either spouse *in anticipation of separation*" is properly considered as a distributional factor under section 50-20(c)(12).[19] *Lawrence v. Lawrence*, 100 N.C. App. 1, 22, 394 S.E.2d 267, 278 (1990) (Greene, J., concurring) (emphasis added). Marital fault, without economic consequences, is not properly considered as a distributional factor. *Smith*, 314 N.C. at 87, 331 S.E.2d at 687.

Defendant contends the trial court erred in considering the following as distributional factors: (A) Defendant's breast implants, liposuction, and cosmetic nose surgeries which she would "take[] . . . with her," performed during the marriage and before the date of separation and paid for by Plaintiff; and (B) Defendant's choice to live in Maryland, instead of in North Carolina with her husband, and the cost incurred by Plaintiff in trying to keep the marriage "afloat" by traveling to Maryland to visit with Defendant.

A

*Defendant's Surgeries*

**[6]** Sometime after Defendant began living more in Maryland than she was living in the marital home in North Carolina, she had two breast implant surgeries, a liposuction surgery performed on her hips, and "several nose jobs." Plaintiff noticed all of Defendant's surgeries while visiting her in Maryland. The charges for Defendant's surgeries were paid for by a credit card supplied to Defendant and paid for by Plaintiff. Defendant testified Plaintiff was "very pleased" with her breast implant surgeries and had encouraged her to have the second surgery.

In this case, assuming without deciding the various surgeries were for non-marital purposes, there is no indication in this record

19. To include as a distributional factor any expenditure of marital funds for a non-marital purpose occurring at any point in the marriage simply would not be workable and, in any event, is not consistent with the concept of the equitable distribution statute which primarily focuses on the events surrounding the dissolution of the marriage.

that the surgeries occurred contemporaneous with marital breakdown or in anticipation of separation. The mere fact Defendant lived a portion of the last few years of the marriage in Maryland, rather than in the marital home with Plaintiff in North Carolina, which is unsupported by any explanation in the record, is simply not sufficient to support a determination the parties were experiencing marital breakdown. Indeed, the evidence establishes Plaintiff and Defendant were still engaged in a marital relationship and Plaintiff had encouraged Defendant to have the second breast implant surgery performed. Accordingly, as there is no evidence the surgeries took place during a period of marital breakdown or in anticipation of separation, the trial court erred in considering the surgeries as a distributional factor.

B

*Defendant's Residence During the Marriage*

[7] The decision of Defendant to primarily reside in Maryland and Plaintiff's decision to travel to Maryland to attempt to keep the marriage "afloat" are not proper distributional factors. Defendant's actions may have contributed to the demise of the marriage, but marital fault alone is not sufficient to support a distributional factor. The costs involved of living in Maryland and traveling to that state to visit were incurred for marital purposes in an attempt to make the marriage work and not for non-marital purposes.

Therefore, because we cannot determine the weight assigned by the trial court in its consideration of these inappropriate distributional factors, this case must be reversed and remanded to the trial court "for a reassessment of its decision to order an unequal division without considering the improper factor[s]." *Becker v. Becker*, 127 N.C. App. 409, 412, 489 S.E.2d 909, 912 (1997).

Affirmed in part, reversed and remanded in part.[20]

Judges McCULLOUGH and CAMPBELL concur.

---

20. We do not address Defendant's remaining assignments of error as she has failed to present any arguments in her brief to this Court relating to those assignments of error. *See* N.C. R. App. P. 28(a).